**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**July 23, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

TRAVIS FORD,

    Defendant - Appellant.

No. 25-5171
(D.C. No. 4:24-CR-00387-JDR-1)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **CARSON**, and **ROSSMAN**, Circuit Judges.
_____

Appellant Travis Ford orchestrated a cryptocurrency Ponzi scheme that defrauded approximately 2,800 investors out of $9.4 million.  For his role in this scheme, Mr. Ford pled guilty to one count of conspiracy to commit wire fraud.  The district court sentenced him to 60 months in prison and three years of supervised release.  It also ordered him to pay restitution to his known victims.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore submitted without oral argument.  This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Mr. Ford challenges his sentence as procedurally unreasonable. Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we affirm.

## I.     BACKGROUND

### A.   *The Cryptocurrency Investment Scheme*

Mr. Ford was co-founder, CEO, and head trader of Wolf Capital Crypto Trading LLC ("Wolf Capital"). During its eight-month lifespan, Wolf Capital purported to operate as a cryptocurrency investment firm that used a "decentralized finance" model to raise funds for trading. In fact, the firm ran a Ponzi-style scheme, soliciting deposits from new investors to pay its existing investors.

Mr. Ford and his co-conspirators lied to investors to induce these deposits. He promised investors returns of 1–2% per day—approximately 547% per year—knowing this was not possible. In June and July 2023, Mr. Ford's social media posts assured investors their funds were secure. But by then, he knew the money was depleted—both because Wolf Capital had suffered trading losses and because he and his co-conspirators had misappropriated investment funds for personal use. In August 2023, Mr. Ford admitted to investors that Wolf Capital had lost money and that he had not been truthful about the firm's activities. In total, Wolf Capital had received approximately $9.4 million[1] from 2,800 investors.

---

[1] Mr. Ford told investigators that of the $9.4 million, Wolf Capital returned an estimated $4–5 million to investors and lost the rest in trading.

### B.   *The Plea Agreement and Change-of-Plea Hearing*

The government charged Mr. Ford by information with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371.  In his plea agreement, Mr. Ford admitted that "[i]n total, Wolf Capital received approximately $9.4 million in investments from approximately 2,800 investors due to the fraudulent conduct."  R. vol. 1 at 55; *see id.* at 53–55.  Mr. Ford's change-of-plea petition admitted the same.  *See id.* at 40.  Based on these admissions, the parties "agree[d] and stipulate[d]" for Guidelines calculation purposes that the offense involved 10 or more victims and a loss amount between $3.5 and $9.5 million.  *Id.* at 58.  The plea agreement also included an appeal waiver.

During the change-of-plea hearing under Federal Rule of Criminal Procedure 11(c), the district court confirmed that Mr. Ford had fully read and understood the plea agreement, that he was aware of the potential penalties he faced, that he had an opportunity to consult with counsel, and that his guilty plea was voluntary.  After the government recited the factual basis for the guilty plea, the court asked Mr. Ford whether those facts—including the approximate loss amount and victim count—were correct.  It similarly asked him whether the plea agreement's "factual basis" section—including the approximate loss amount and victim count—was accurate.  Mr. Ford answered affirmatively to both questions.  The court accepted Mr. Ford's guilty plea and ordered the preparation of a presentence investigation report ("PSR").

During the hearing, the district court also inquired about the government's efforts to locate victims.  The government said it had identified only a small number, explaining that although the remaining victims' deposits with Wolf Capital were publicly recorded,

their identities could not be determined due to the anonymity afforded participants in the blockchain. The government further explained that it had not done a forensic tracing of the victims' individual cryptocurrency wallets, believing that course to be unwarranted due to the plea agreement's stipulated loss amount and victim count. After this discussion, the court authorized the government to use alternative procedures (e.g., publication on social media and the Department of Justice's website) to locate victims for notice and restitution purposes. Using these procedures, the government identified eight victims defrauded of $174,477.29.

## C. *Sentencing*

Mr. Ford's PSR calculated his base offense level at six under United States Sentencing Guidelines ("U.S.S.G.") §§ 2B1.1(a)(2) and 2X1.1(a). It then applied:

- an 18-level increase under § 2B1.1(b)(1)(J) for a loss amount of more than $3.5 million but less than $9.5 million;

- a two-level increase under § 2B1.1(b)(2)(A) based on 10 or more victims;

- a two-level increase under § 2B1.1(b)(10)(B) and (C) because a substantial part of the offense was committed abroad and involved sophisticated means;

- a two-level increase under § 3B1.1(c) for Mr. Ford's role as an organizer, leader, manager, or supervisor in the offense; and

- a two-level decrease under § 3E1.1(a) for acceptance of responsibility.[2]

---

[2] As explained below, Mr. Ford later objected to the loss amount and victim count stated in the PSR (and previously stipulated to in the plea agreement). From this, the government determined that Mr. Ford had "advance[d] false or frivolous issues in mitigation," and thus declined to move under § 3E1.1(b) for an additional one-level decrease for acceptance of responsibility. R. vol. 1 at 73 n.1 (internal quotation marks omitted).

4

Mr. Ford's total offense level of 28, together with his category I criminal history, yielded a Guidelines range of 78 to 97 months in prison.  But because the statutory maximum sentence was a five-year term, the resultant prison term under § 5G1.1(a) was 60 months.[3]

Mr. Ford objected to the PSR's loss amount and victim count, arguing these numbers were impermissibly speculative.  He said the $9.4 million loss amount should have been reduced to $174,477.29 because that was the financial loss the government had ascertained in its efforts to identify victims.  He also argued the 2,800-victim count was inaccurate because the government had identified only eight victims.

In response to the district court's questions at the sentencing hearing about these objections, defense counsel agreed that restitution and loss amounts are conceptually distinct and that the government's use of alternative notice procedures to identify victims would not affect the loss amount.  Counsel further acknowledged the parties' stipulation that Wolf Capital had received approximately $9.4 million in investment funds from approximately 2,800 victims.

Following argument from the parties, the district court overruled Mr. Ford's PSR objections, citing the stipulations in the plea agreement and change-of-plea petition, as well as statements Mr. Ford made to investigators.  Relying largely on the PSR's

---

[3] U.S.S.G. § 5G1.1(a) provides: "Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence."

calculations,[4] the court sentenced Mr. Ford to 60 months in prison, followed by three years of supervised release.  It also ordered him to pay $174,477.29 in restitution.

## II.  DISCUSSION

### A.  *Standard of Review*

When reviewing a sentence for procedural reasonableness, we consider whether the district court committed "significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007); *accord United States v. McCrary*, 43 F.4th 1239, 1244 (10th Cir. 2022).

We review for abuse of discretion, "under which we review de novo the district court's legal conclusions regarding the guidelines and review its factual findings for clear error." *United States v. Gantt*, 679 F.3d 1240, 1246 (10th Cir. 2012); *see Gall*, 552 U.S. at 51; *United States v. McDonald*, 43 F.4th 1090, 1095 (10th Cir. 2022).  A district court's loss calculation under § 2B1.1(b)(1) and victim count under § 2B1.1(b)(2)(A) are factual determinations that we review for clear error.  *See United States v. Leach*, 417 F.3d 1099, 1105-06 & n.8 (10th Cir. 2005); *accord United States v. Sutton*, 520 F.3d 1259, 1262 (10th Cir. 2008).

---

[4] The district court found a $3.5 million loss amount (rather than the PSR's $9.4 million loss amount) by deducting the $4–5 million that Mr. Ford claimed had been refunded to Wolf Capital investors.  *See* n.1, *supra*; *see also* U.S.S.G. § 2B1.1, cmt. n.3(D)(i).  This deduction did not alter the upward adjustment under § 2B1.1(b)(1)(J).

## B.    *Analysis*

Mr. Ford argues the district court procedurally erred when it relied on the stipulated loss amount and victim count to calculate his Guidelines offense level.  This argument fails.[5]

First, Mr. Ford admitted in his plea agreement, change-of-plea petition, and Rule 11 colloquy that Wolf Capital had fraudulently received $9.4 million from 2,800 investors.  "Absent special circumstances, a stipulation binds the parties who make it." *MVT Servs., LLC v. Great W. Cas. Co.*, 118 F.4th 1274, 1286 (10th Cir. 2024) (internal quotation marks omitted).  And "this court is reluctant to relieve parties from the benefits[] or detriments of their stipulations."  *Stafford v. Crane*, 382 F.3d 1175, 1180 (10th Cir. 2004) (ellipsis and internal quotation marks omitted).  The stipulations thus preclude Mr. Ford from challenging the loss amount and victim count that the district court used in calculating his sentence.  *See United States v. Newman*, 148 F.3d 871, 877–78 (7th Cir. 1998) (defendant's challenges to conspiracy time frame and loss amount were precluded by stipulations in his plea agreement).[6]

---

[5] The government seeks to enforce the appeal waiver in the plea agreement, but we exercise our discretion to reach the merits.  *See United States v. Garcia-Ramirez*, 778 F.3d 856, 857 (10th Cir. 2015).

[6] *See also United States v. Teeter*, 257 F.3d 14, 29 (1st Cir. 2001) (because defendant "admitted the underlying facts that supported the sentencing court's resort to the stipulated [Guideline], she is unable to challenge that decision on appeal"); *United States v. Woods*, 554 F.3d 611, 614 (6th Cir. 2009) ("The parties stipulated to [the loss amount] as part of the plea agreement.  Therefore, [defendant's] challenge to the use of that figure to enhance her sentence is unavailing.").

Second, the district court's factual findings based on the stipulated loss amount and victim count were not clearly erroneous. "[F]actual findings at the sentencing stage must be supported by a preponderance of the evidence," *United States v. Robertson*, 946 F.3d 1168, 1171 (10th Cir. 2020), a standard amply met here. On the loss amount, the Guidelines instruct that a sentencing court "need only make a reasonable estimate of the loss," with the estimate "be[ing] based on available information." U.S.S.G. § 2B1.1, cmt. n.3(B). And here, the "available information" of the $9.4 million loss came from Mr. Ford's own stipulations and statements to investigators, relieving the government of having to procure and present other evidence of the loss amount. *See Newman*, 148 F.3d at 878. On the victim count, the Guidelines specify that a "victim" is "any person who sustained any part of the actual loss." U.S.S.G. § 2B1.1, cmt. n.1. And here, Mr. Ford repeatedly admitted that 2,800 investors incurred financial losses from Wolf Capital's fraudulent conduct, well above the 10 needed for the two-level increase under § 2B1.1(b)(2)(A).

Mr. Ford contends that because only eight victims had made restitution claims totaling $174,477.29, the district court erred in adopting the less-certain loss amount and victim count stipulated in the plea agreement and change-of-plea petition. But restitution for known victims and financial loss caused by the offense are not necessarily the same, and only the latter matters for Guidelines applicable here. *See United States v. Singletary*, 649 F.3d 1212, 1220 (11th Cir. 2011) (explaining the difference); *accord Woods*, 554 F.3d at 614. Mr. Ford and his counsel acknowledged this distinction between loss amount and restitution during the sentencing hearing. They further conceded that the government's

8

efforts to locate victims for restitution did not limit or alter the stipulated $9.4 million loss amount.

For these reasons, the district court's findings regarding the loss amount and victim count were not clearly erroneous.

### III.  CONCLUSION

We affirm Mr. Ford's sentence.

Entered for the Court


Scott M. Matheson, Jr.
Circuit Judge